# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- | ) |
| | ) |
| Delta Engineering, Inc. | ) ASBCA No. 58063 |
| | ) |
| Under Purchase Order No. 0000017897 | ) |
| Contract No. 000000-00-0-0000 (Implied-in-Fact) | ) |

APPEARANCE FOR THE APPELLANT: Michael J. Trevelline, Esq.
  Law Office of Michael Trevelline
  Washington, DC

APPEARANCES FOR THE AUTHORITY: Kathryn H.S. Pett, Esq.
  General Counsel
  Donald A. Laffert, Esq.
  Associate General Counsel
  Jeffrey Weinstein, Esq.
  Assistant General Counsel
  Washington Metropolitan Area
   Transit Authority
  Washington, DC

## OPINION BY ADMINISTRATIVE JUDGE PEACOCK ON THE AUTHORITY'S MOTION TO DISMISS

Delta Engineering, Inc. (Delta or appellant) asserts that its interactions with the Washington Metropolitan Area Transit Authority (WMATA) gave rise to an implied-in-fact contract with WMATA. WMATA has moved to dismiss the appeal for lack of jurisdiction and also challenges certain relief requested by appellant. The motion is denied in part and granted in part for reasons detailed below.

## STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

1. Delta is an engineering and manufacturing business that provides custom-engineered products (compl. ¶ 6). It is incorporated in the State of Maryland (compl. ¶ 5).

2. WMATA was created by an interstate compact entered into by the District of Columbia, the State of Maryland, and the Commonwealth of Virginia. *See Watters v. Washington Metropolitan Area Transit Authority*, 295 F.3d 36, 39 (D.C. Cir. 2002), *cert. denied*, 538 U.S. 922 (2003). Congress approved the compact in 1960. Pub. L. No. 86-794, 74 Stat. 1031. The compact was amended and Congress, in 1966, consented to,

adopted, and enacted for the District of Columbia the amendment which was titled the Washington Metropolitan Area Transit Authority Compact (Compact). Various parts of the Compact were later amended and approved by the signatories and Congress. *See* Pub. L. No. 89-774, 80 Stat. 1324; *Watters*, 295 F.3d at 39 n.3. WMATA operates a mass-transit system located in the Washington, DC metropolitan area (compl. ¶ 4).

3. Section 80 of the Compact is designated "Liability for Contracts and Torts." It provides as follows (80 Stat. 1350):

> The Authority shall be liable for its contracts and for its torts and those of its Directors, officers, employees and agents committed in the conduct of any proprietary function, in accordance with the law of the applicable Signatory (including rules on conflict of laws), but shall not be liable for any torts occurring in the performance of a governmental function. The exclusive remedy for such breach of contracts and torts for which the Authority shall be liable, as herein provided, shall be by suit against the Authority. Nothing contained in this Title shall be construed as a waiver by the District of Columbia, Maryland, Virginia and the counties and cities within the Zone of any immunity from suit.

4. Delta has supplied minor products to WMATA since 2001 (compl. ¶ 8). In 2007, WMATA initiated discussions with Delta about manufacturing a major, custom-engineered article – stock #R18237040 Rohr 1000 series Friction Ring (friction rings or rings) (compl. ¶ 9). After reviewing technical specifications, Delta determined that it could engineer and locally cast the friction rings (compl. ¶ 12). Knorr Brake Corporation (Knorr) was the original equipment manufacturer of the rings (compl. ¶¶ 52-53).

5. After appellant gave WMATA a rough estimate and WMATA made a more formal request, Delta provided a quote of $90,000 for development of 100 friction rings (compl. ¶¶ 13-16). On 11 June 2007, WMATA issued the captioned purchase order (PO) to Delta for 100 friction rings at $900 per ring (compl. ¶ 17, ex. B). The purchase order is sometimes referenced hereinafter as the development contract.

6. Delta asserts that during discussions in connection with and before issuance of the PO, WMATA promised that, if the rings were fully tested and found acceptable, appellant would be eligible to compete on future WMATA procurements of the friction rings. Delta allegedly stated that it would only make the investments necessary to produce the rings if it were eligible to so compete and WMATA allegedly agreed that Delta would be eligible and have that opportunity. Appellant refers to these commitments as the "Agreement." (Compl. ¶¶ 19-21)

2

7. Delta and WMATA met on 4 March 2008 and agreed on production standards, tests to be performed, and a reduction in the order from 100 rings to 36 (compl. ¶ 23). Michael DiPietro, appellant's president, attended for Delta (compl. ¶ 25). Several executives, branch managers, engineering and procurement representatives attended for WMATA (compl. ¶ 24).

8. On 5 March 2008, WMATA employee, Ronald S. Johnson, prepared a memorandum with minutes of the 4 March 2008 meeting (compl. ¶ 26, ex. C). The minutes stated:

> This memo is written to present meeting minutes with Michael DiPietro from Delta Engineering concerning brake discs. The meeting was held at the New Carrollton S&I facility on 03/04/08. Attendees included: Les Durrant, Gene Garzone, Dennis Early, Ivone Gopaul, Ed Totten, Michael Quander, Wallace Dent, Ron Johnson, and Michael DiPietro.
>
> Delta Engineering has been a supplier of many items to the Authority for several years and has always delivered a high-quality product. Due to dire needs of the Authority concerning the Knorr Friction Ring for the Rohr 1000 Series Railcars, Procurement has contracted with Delta Engineering for an initial delivery of 100 friction rings. Delta Engineering has reversed engineered, provided drawings and material analysis of the current disc, and has contracted with foundries, primarily a foundry located in York, Pennsylvania, for the production of these discs.
>
> Since Delta Engineering does not have experience in the rail brake disc business, the attendees were concerned and stressed the need for dynamometer testing. It was proposed that Delta perform Finite Element Analysis (FAE) and dynamometer testing according to specifications provided by WMATA. Delta is to provide a price that includes a ROM cost for the additional work. They will also provide an estimate as the amount of the cost they are to absorb and [how] much of the cost WMATA will cover....
>
> A revised specification for brake discs will be provided to Delta Engineering and other companies who are interested in

3

supplying brake discs to the Authority. The specification will include FEA, dynamometer, and route profile specifications.

Prior to production, the supplier must provide to the Authority a work schedule in order to determine realistic delivery dates.

The material Delta Engineering suggests for this disc would be the same as the material used by Knorr. The attached e-mail indicates Delta's intent for conducting business with WMATA.

Delta Engineering understands the need to deliver a quality part within a reasonable time period once an order has been placed and is prepared to fulfill their obligations. Delta will investigate FEA and dynamometer testing, a report will be sent to procurement. During the qualifying stage, a quote for multiple units will be provided to the Authority.

Procurement has the responsibility to negotiate the terms of the contract with the suppliers. Conditions of the specifications must be met prior to Engineering evaluations of the discs for a one-year qualification test.

(Compl., ex. C)

9. The Johnson memorandum attached an undated email from Mr. DiPietro to WMATA which stated in part:

I am writing you today to provide status on Delta Engineering's progress towards the supply of [the rings].... Delta Engineering Inc. is performing a collaborative and self funded engineering/development effort to become a friction ring supplier. We have taken the existing rings, reverse engineered them using metallurgical evaluation, mechanical testing, chemical analysis and performed full dimensional inspections. We have used this information to develop a manufacturing routine that shall result in identical product. Delta Engineering has also worked with your engineering dept to understand their concerns and have positioned process inspections along the manufacturing route to ensure quality product. As we understand the program Delta Engineering Inc. is to supply a min of 36/100 of our manufactured parts

4

for the authority to test. Once these parts pass the testing and Delta Engineering is granted approval to supply these parts the balance of the order shall be honored.

It is our intent to provide to the authority an annual volume of 400+ friction rings; however it is understood that the authority may want more or less rings from us, at which time an "immediately-available" quantity, lead time for other quantities and price shall be negotiated. It is also our intent to work closely with the authority to develop alternatives to the existing design to include: material, shape, and "cross-compatible" solutions.

Our progression towards the supply of the first 36 units has been slower than anticipated but we are making strides towards this end. In short these delays have pushed back the supply of parts from Q4-07 to Q1-08.

(Compl., ex. D)

10. Appellant asserts that its email "makes it quite clear that Delta understood that it had been promised the opportunity to become a supplier if its friction rings were of an acceptable quality" (compl. ¶ 28).

11. On 24 March 2008, appellant sent WMATA a quote for 36 friction rings at $1,911.10 each for a total cost of $68,799.60. Delta stated, *inter alia*, that it would provide destructive dynamometer testing and part specific traceability to lot chemistry and microstructure, but not finite elemental analysis. With respect to pricing, the quote concluded:

Delta Engineering Inc. has increased the unit price / disc on this order only to accommodate the above mentioned changes. $900 original price + $250 to account for the decrease in quantity + $761.10 to cover the cost of performing dynamic testing of the friction rings ($27,400) = $1911.10 / disc[.]

Delta Engineering Inc. has also invested $9,500 of design and engineering efforts into this project. Delta Engineering Inc. has purchased a custom foundry die for this project. Neither of these expenditures are to be recovered in the pricing quoted above. These expenses are to be considered Delta Engineering's cost-share. It is also important to note that our

pricing shall remain $900 with the exception of additional testing or expediting requirements that may result from this collaborative effort.

(Compl. ¶ 29, ex. E)

12. WMATA revised its 11 June 2007 PO on 24 March 2008 to take into account the 24 March 2008 Delta quote. The PO required appellant to deliver the 36 friction rings to a WMATA address in Landover, Maryland. WMATA's "Buyer" listed in the PO was Ivone Gopaul who attended the 4 March meeting. (Compl. ¶ 29, ex. F)

13. Delta avers that it manufactured the 36 friction rings, delivered them to WMATA, and provided engineers to assist WMATA in testing the rings. Appellant claims that its friction rings achieved superior performance. WMATA allegedly stated that it was pleased with the rings, and indicated that Delta would "most likely win any future contracts" to supply the rings. (Compl. ¶¶ 30-34)

14. WMATA issued an Invitation for Bid (IFB) relating to the friction rings in June 2010 (compl. ¶ 35, ex. G). The original IFB sought bids for 500 friction rings in the base year and 500 friction rings for each of 4 option years (compl. ¶ 35, ex. G at 6-7). The description of the part for each year allowed bidders to supply either friction rings manufactured by Knorr or friction rings manufactured by Delta (compl., ex. G at 6-7). The contract awarded pursuant to this solicitation is sometimes referenced hereinafter as the production contract.

15. The Solicitation Instructions for the IFB included clause No. 4, "PRIOR REPRESENTATIONS." This clause stated as follows: "The Authority assumes no responsibility for any understanding or representations concerning this solicitation made by any of its officers or agents prior to the issuance of the solicitation, the specifications, or related documents." (Compl., ex. G at 8)

16. The solicitation, as well as the development contract/purchase order, incorporated WMATA's General Provision "DISPUTES" clause which states:

> (a) Except as otherwise provided in this Contract, any dispute concerning a question of fact arising under or related to this Contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his/her decision to writing and mail or otherwise furnish a copy thereof to the Contractor. The decision of the Contracting Officer shall be final and conclusive unless, within thirty (30) calendar days from the date of receipt of such copy, the Contractor mails or

6

otherwise furnishes to the Contracting Officer a written notice of appeal addressed to the Authority Board of Directors. Such notice would indicate that an appeal is intended and should reference the decision and contract number. The decision of the Board of Directors or its duly authorized representative for the determination of such appeals shall be final and conclusive unless in proceedings initiated by either party for review of such decision in a court of competent jurisdiction, the court determines the decision to have been fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence. In connection with any appeal proceeding under this clause, the Contractor, or the Authority, as the case may be, shall be afforded an opportunity to be heard and offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the Contract and in accordance with the Contracting Officer's decision. The Armed Services Board of Contract Appeals is the authorized representative of the Board of Directors for final decisions on an appeal.

(b) This DISPUTES clause does not preclude consideration of question [sic] of law in connection with decisions provided for in Section a. above. Nothing in the Contract, however, shall be construed as making final the decisions of the Board of Directors or its representative on a question of law.

(Compl., ex. G at GP-15 to GP-16; ex. B)

17. Special Provision Clause 37, "GOVERNING LAW," stated: "This contract shall be deemed to be an agreement under and shall be governed by the law of the District of Columbia, exclusive of its conflict of law principles, and the common law of the U.S. Federal contracts including precedents of the Federal Boards of Contract Appeals" (compl., ex. G at SP-19).

18. Delta avers that it "went through the trouble and expense of submitting a bid" based on promises that it would have that opportunity and on the IFB statement that its friction rings met WMATA's specifications (compl. ¶¶ 38-39). Appellant specifically noted that it was required to obtain a bid bond of $165,575. It obtained the bond by

7

providing a lien on real estate. The bank holding the bond will not release the bond because WMATA will not release Delta's bid guarantee letter which Delta views as evidence that WMATA essentially admits it promised appellant the right to bid on solicitations. (Compl. ¶¶ 40-42)

19. Appellant also notes that it took special efforts to comply with the IFB requirement that friction rings were required shortly after award and with a modification of the IFB (not in the record) to add a line item seeking 800 rings "with a clause requiring initial delivery as soon as possible." Delta was required to immediately proceed with the manufacture of 50 friction rings so they could be delivered in the first weeks of the contract. (Compl. ¶¶ 44-49)

20. Delta allegedly submitted the lowest bid in response to the IFB in June 2010. It alleges that its profit for the base year and 4 option years would have been $827,875 given the prices bid and 25 percent profit. (Compl. ¶¶ 50-51) Knorr also submitted a bid (compl. ¶¶ 52-53).

21. Delta avers that it was initially told by WMATA that it had lost the friction ring production contract. In a second conversation with WMATA's procurement office, appellant alleges it was told that it had been awarded the contract. In a third conversation, WMATA allegedly informed Delta that WMATA would award a partial order "and that engineering was making provisions to place Delta discs alongside Knorr discs on its trains." Thereafter, WMATA indicated Knorr would be awarded the contract allegedly because of a mistake by WMATA. WMATA allegedly stated that its internal rules only allowed it to purchase equipment from an OEM, and Delta was never qualified to bid on the IFB. The rule was allegedly based on a policy mandate from the WMATA quality department that brake discs could only be purchased from an OEM, i.e., Knorr. (Compl. ¶¶ 54-59)

22. Delta avers that WMATA did not offer any explanation for the policy change, whether the change had been discussed, if so, who had discussed it, when the change was made, or why it appeared to be made after Delta was the low bidder on the friction ring IFB. In appellant's view, these questions could have been answered if it had filed a bid protest. Delta alleges it did not do so because the WMATA procurement manager advised that instead of pursuing a bid protest Delta should bid on the friction ring contract which would be up for renewal each year. Appellant asserts that it followed this "legal" advice to its detriment and in doing so missed out on profits that it might have earned under the contract. (Compl. ¶¶ 63-66)

23. In November 2011, Delta submitted a claim regarding the friction rings matter to a WMATA contracting officer. The contracting officer did not respond to the claim. (Compl. ¶ 1, ex. A) In February 2012, appellant filed a deemed denial appeal with the WMATA Board of Directors (compl. ¶ 2, ex. I). WMATA issued a letter essentially

8

denying Delta's appeal on 14 March 2012 based on arguments addressed in our decision below (compl. ¶ 3, ex. K).

24. By letter of 30 March 2012, Delta filed an appeal from the WMATA denial with this Board. The appeal was docketed ASBCA No. 58063 on 4 April 2012.

25. Appellant's complaint includes eight causes of action. In Count I, Delta asserts breach of an implied-in-fact contract. Under the claimed implied-in-fact Agreement, Delta alleges it would be allowed to compete for disk brake contracts if it invested in the engineering and manufacturing of dies for the friction rings, participated in tests of the rings, and produced acceptable quality rings. Appellant alleges it did so because WMATA represented that the agreement was presented to people who had authority to ratify it and they did so. Delta claims it incurred costs totaling $206,466.48 to engineer, manufacture and test the rings. (Compl. ¶¶ 67-80)

26. Count II of the complaint contends that the Agreement included a covenant of good faith and fair dealing that was breached by WMATA resulting in damages of $206,466.48 (compl. ¶¶ 81-85).

27. Delta argues that various WMATA officials told them that it would be able to bid on future brake disk solicitations, that it would be in a good position to receive contracts. Delta asserts the statements were false, appellant detrimentally relied on them, and WMATA benefitted from Delta's reliance. As a result, in Count III Delta claims it is entitled to compensation of $206,466.48 and punitive damages of $1,000,000. (Compl. ¶¶ 86-97)

28. In Count IV, appellant characterizes the statements it says were made by WMATA officials as negligent misrepresentations, and requests compensation of $206,466.48 and punitive damages of $1,000,000 (compl. ¶¶ 98-102).

29. Count V is labeled "Implied-in-Fact Unjust Enrichment." Delta contends that it provided valuable services in that WMATA was able to point to the price of the friction rings provided and obtain price reductions from Knorr. WMATA obtained and accepted the benefits and it would be inequitable to allow WMATA to retain them. Appellant says it is entitled to at least $1,000,000. (Compl. ¶¶ 103-10)

30. Appellant maintains, as to Count VI, that it made benefits available to WMATA with the expectation that it would be allowed to compete for friction ring contracts under an "Implied-in-Fact Quantum Meruit" theory. Because Delta was not allowed to compete, it is entitled to damages of at least $1,000,000. (Compl. ¶¶ 111-17)

31. Count VII alleges breach of an implied-in-fact contract under which WMATA was to provide legal advice to appellant. This is based on Delta's conversation with the

9

WMATA procurement manager who stated that appellant should not file a bid protest but instead pursue future disk brake contracts. Delta said a bid protest would have been successful and it lost profits by accepting the procurement manager's legal advice. Appellant claims damages of $827,875. (Compl. ¶¶ 118-34)

32. In Count VIII, appellant argues that WMATA's rejection of its friction ring bid was done in bad faith citing what it sees as conflicting rationales for the denial. Delta says it is entitled to compensation of $206,466.48 and punitive damages of $1,000,000. (Compl. ¶¶ 135-40)

33. The Memorandum of Understanding Between the Armed Services Board of Contract Appeals and the Washington Metropolitan Area Transit Authority (Memorandum of Understanding), dated 10 January 2001, as extended in October 2007, states in relevant part as follows:

> WHEREAS, both the Authority and the ASBCA are willing to continue the relationship whereby the ASBCA will adjudicate disputes under the WMATA contracts.
>
> NOW THEREFORE, the Authority and the ASBCA have reached the following stipulations and agreements:
>
> 1. The ASBCA shall provide a forum, together with all necessary services and facilities, for administrative resolution under Authority contracts containing a "Disputes" article for all appeals from final decisions of contracting officers issued under such contracts.

## DECISION

WMATA contends that we lack jurisdiction to decide this appeal and alternatively asserts that we lack authority to grant certain relief requested by Delta.

Jurisdiction

Appellant's claim is based in essential part on an alleged implied-in-fact contract between Delta and WMATA. WMATA's primary jurisdictional defense to these allegations is that any agreement contained no Disputes clause which is essential to the Board's authority to resolve WMATA disputes. The Board's agreement with WMATA confers authority to resolve appeals from the decisions of WMATA contracting officers pursuant to the provisions of the Disputes clause of WMATA contracts. Recently, we have detailed the history and evolution of the WMATA Disputes clause and concluded that under the current clause the Board has jurisdiction to resolve breach claims "related

10

to" WMATA contracts. *Cubic Transportation Systems, Inc.*, ASBCA No. 57770, 12-2 BCA ¶ 35,063 at 172,233-35.

The issue now before us is whether the Board's agreement with WMATA precludes consideration of implied-in-fact contract claims that do not expressly contain a "Disputes clause" because they are unwritten in whole or in part. WMATA's contentions are to be distinguished from government motions under the CDA that challenge our jurisdiction to resolve "implied-in-fact" contractual disputes. We have typically treated the latter as motions for failure to state a claim for which relief could be granted (*see Engage Learning, Inc. v. Salazar*, 660 F.3d 1346 (Fed. Cir. 2011)) or for summary judgment. As we stated in *Ortiz Enterprises, Inc.*, ASBCA No. 52049, 01-1 BCA ¶ 31,155 at 153,894:

> To determine whether we have jurisdiction in a case of an alleged implied-in-fact contract, we in effect rule on the merits of the appeal as we would on a motion for summary judgment. *See Reynolds Shipyard Corp.*, ASBCA No. 37281, 90-1 BCA ¶ 22,254 at 111,827; *Choe-Kelly, Inc.*, ASBCA No. 43481, 92-2 BCA ¶ 24,910 at 124,221 (where an implied-in-fact contract has been alleged, jurisdiction is intertwined with determining the merits of the allegation. The ASBCA has jurisdiction to entertain the appeal, at least to the point of establishing the existence of an implied contract. A Government motion to dismiss for lack of jurisdiction would cut off that claim in the same manner as a motion for summary judgment); *Balboa Systems Co., Inc.*, ASBCA No. 39400, 91-2 BCA ¶ 23,715 at 118,702 (Government motion based on contention of no implied-in-fact contract, is more accurately one for summary judgment...).

In essence, the pleading of a valid implied-in-fact contract is generally sufficient to support jurisdiction. *Total Medical Mgmt., Inc. v. United States*, 104 F.3d 1314, 1319 (Fed. Cir.), *cert. denied*, 522 U.S. 857 (1997); *see also Protecting the Homeland Innovations, LLC*, ASBCA No. 58366, 13 BCA ¶ 35,398 at 173, 667. Unlike our CDA jurisdiction, where we now routinely assume jurisdiction over both express and implied-in-fact contract disputes (41 U.S.C. § 7102(a)), our agreement with WMATA provides for jurisdiction based on the presence of a contract with a Disputes clause. WMATA considers that jurisdiction is thus dependent on the presence of a formal, express contract. Taken to their logical conclusion, WMATA's contentions would deprive the Board of any jurisdiction over implied-in-fact contracts and authority to consider potentially actionable contractual communications by authorized WMATA

officials unless they relate to an express written agreement that contains a Disputes clause.

WMATA's motion challenges primarily our jurisdiction to decide claims related to implied-in-fact contracts. Accordingly, this decision does not address the merits of appellant's assertions or discuss in detail the elements of proof required to establish that the parties entered into an implied-in-fact contract. Those elements of proof are: mutual intent to contract, unambiguous offer and acceptance, consideration and contracting authority on the part of the WMATA official(s) alleged to have entered into the agreement. *E.g., City of El Centro v. United States*, 922 F.2d 816, 820 (Fed. Cir. 1990), *cert. denied*, 501 U.S. 1230 (1991). Appellant has the burden of proving that we have subject matter jurisdiction. *Corporate Systems Resources, Inc.*, ASBCA No. 58398, 13 BCA ¶ 35,367 at 173,553; *see also Rahil Exports*, ASBCA No. 56832, 10-1 BCA ¶ 34,355; *RGW Communications, Inc. d/b/a Watson Cable Co.*, ASBCA Nos. 54495, 54557, 05-2 BCA ¶ 32,972.

WMATA's waiver of sovereign immunity "for its contracts" in Section 80 of the WMATA Compact has been interpreted implicitly by the courts to apply to alleged breach of "implied-in-fact" contracts. *See, e.g., Fulcrum Int'l, Inc. v. Prince George Center I, Inc. & WMATA*, 2011 U.S. Dist. LEXIS 104266 (D. Md. Sept. 15, 2011); *Monument Realty LLC v. WMATA*, 535 F. Supp. 2d 60, 70-72 (D.D.C. 2008). The question before us is whether our MOU with WMATA and our consensual jurisdiction prescribed therein encompasses such "implied-in-fact" contract claims. The problematic, complicating distinction is that the MOU requires the presence of a Disputes clause according to WMATA. For the reasons stated hereinafter and to the extent that the gravamen of appellant's averments relates to an implied-in-fact contract, we have jurisdiction to determine whether such a contract was entered into by the parties and resolve disputes related thereto. Although we agree with WMATA that the clause is a prerequisite to our jurisdiction, we consider that the clause is mandatory and required to be incorporated into the contract alleged here if proven. Alternatively, we consider that the claimed implied terms are sufficiently "related to" the development contract purchase order which did expressly set forth the Disputes clause.

First, if the implied contract is established, that contract must contain a Disputes clause in compliance with WMATA acquisition procedures. Section 2102.1 of the WMATA Procurement Manual (2004) requires that "all contracts [for supplies and services] entered into on behalf of the Authority in an amount in excess of $10,000...shall include a disputes clause." Application of this mandatory requirement is not restricted to express contracts and we see no reason not to apply the requirement to "implied-in-fact" contracts where the elements of such contracts are established. Prior to the CDA when our jurisdiction was also dependent on a Disputes clause, we similarly concluded in *Vitro Corp. of America*, ASBCA No. 14448, 72-1 BCA ¶ 9287 at 43,026-27:

12

> [I]t is often said that the Board is without authority to grant relief under a contract implied in fact or an express offer supported by an implied acceptance because, it is assumed, such contracts may not contain the standard Disputes clause. This is an impermissible jump in logic, as cases may and do arise in which we are called upon to determine whether as a matter of fact and law a course of conduct resulted in an express or implied contract incorporating the standard Disputes clause....
>
> ...[T]he Board has inherent authority to determine the existence or nonexistence of a contract whenever such a determination is a necessary predicate to the resolution of a dispute alleged to arise under the terms of either an express or implied contract that allegedly provides an appropriate administrative remedy.

Alternatively, we consider that the gravamen of the dispute may properly be considered to "relate to" the purchase order. Here the purchase order expressly sets forth the Disputes clause. The implied-in-fact agreement may be viewed as implied ancillary terms and conditions of that purchase order.

WMATA does not contend that the existence of the express purchase order, intended to prequalify appellant as an approved source for the rings, precludes the existence of an implied contract. *Cf. Atlas Corp. v. United States*, 895 F.2d 745, 754-55 (Fed. Cir.), *cert. denied*, 498 U.S. 811 (1990) (certain claimed stabilization costs were related to the express contract costs that were included in the contract price; therefore, there could be no implied agreement to pay costs over and above those prices). WMATA makes no argument that any implied agreement was encompassed by, or involved the same subject matter as, the express purchase order. Here, the alleged ancillary arrangement was "related to" the purchase order as delineated by the parties' negotiations which were structured and focused on the pricing and details of the prequalification requirements. However, both parties were aware that development costs had been carved out of the purchase order negotiations based on the alleged unwritten understanding. Appellant expressly excluded such costs in pricing the purchase order, allegedly on assurances from WMATA that, if its friction rings proved satisfactory, Delta would be eligible to compete on subsequent friction ring procurements and its offers would be fairly considered in good faith by WMATA. Here, the alleged agreement was severed from, and not within, the agreed scope of the purchase order. *Cf. Trauma Service Group v. United States*, 104 F.3d 1321 (Fed. Cir. 1997) (alleged implied term of express contract regarding x-ray technician services was covered by and within the scope of, the express contract; facts otherwise failed to establish the existence of the implied-in-fact contract relating to the services).

13

The authority of the WMATA officials allegedly making the representations to appellant is simply one of the elements for determination by the Board in assessing whether an implied-in-fact agreement was formed. *See, e.g., Digicon Corp.*, ASBCA No. 36907, 89-3 BCA ¶ 21,966 (Authority issues, including ratification, go to the merits of the claim not our jurisdiction to entertain the appeal.). *Cf. Monument Realty*, 535 F. Supp. 2d at 70-72.

Here, the production contract solicitation's "PRIOR REPRESENTATIONS" clause also does not insulate WMATA from liability. If proven (including mutual intent and assent), the communications between the parties established an implied-in-fact contract that could not be unilaterally abrogated by a clause in a solicitation issued more than a year after that contract was formed. In context, communications emanating from WMATA during negotiations contemporaneous with issuance and amendment of the purchase order were not merely "representations" within the meaning and intent of the later production contract solicitation clause. Moreover, in this case the essence of the alleged agreement appears corroborated by WMATA's express incorporation of the alternative Delta specification/design for the rings into the production contract solicitation and schedule.

Additional Jurisdictional Issues and Authority to Grant Relief Requested

To the extent that we conclude that WMATA and appellant entered into an implied-in-fact agreement, the relief and remedies available will depend on the precise nature and scope of that agreement and any breach. As stated above, we do not address the merits of the parties' contentions in this decision. The parties' arguments regarding potential relief and remedies are therefore, in significant part, premature. We decline to address them at this early stage in the litigation pending further development of the record.

Nevertheless, we agree with WMATA that it is immune from liability for punitive damages. *See, e.g., WMATA v. Quik Serve Foods, Inc.*, 402 F. Supp. 2d 198, 203 (D.D.C. 2005); *Wainwright v. WMATA*, 958 F. Supp. 6, 9-10 (D.D.C. 1997). We further concur with WMATA that it has not waived its sovereign immunity from liability for interest and therefore interest is not recoverable by appellant in this appeal. *Cubic Transportation Systems*, 12-2 BCA ¶ 35,063 at 172,235; *Breda Transportation, Inc.*, ENG BCA No. 6239, 98-2 BCA ¶ 30,027; *Kingston Constructors, Inc. v. WMATA*, 860 F. Supp. 886 (D.D.C. 1994); *Muhtesem Co.*, ASBCA No. 57538, 12-1 BCA ¶ 34,946. Accordingly, we grant WMATA's motion to strike portions of the complaint seeking punitive damages and interest because we lack authority to grant the requested relief.

We are also without jurisdiction to resolve appellant's allegations in Counts VII and VIII that it was given incorrect legal advice (ostensibly from a non-lawyer) not to

14

protest award of the production contract. Those counts in essence seek to equitably estop WMATA from disavowing that alleged misadvice. Whether the misadvice or "malpractice" allegations are categorized as a tort or a species of contract, we are without jurisdiction. The allegations do not relate to or arise out of the implied contract in dispute. The alleged "legal malpractice" is unrelated in time and substance to the operative facts involved in the alleged implied-in-fact contract in this appeal. It is not an acquisition by WMATA for services, supplies, or construction covered by its Procurement Procedures Manual. It incorporates no Disputes clause and none would be required by the Manual for the alleged "contract." To the extent the allegations have "contractual" significance, we would have no jurisdiction over the subject matter of such a non-procurement contract. More fundamentally, we can envision no circumstances in this case where the WMATA official had authority to give legal advice to the contractor that could form the subject matter of a binding contractual commitment. We also consider that appellant could not reasonably have relied on that gratuitous advice.

WMATA further contends that any implied-in-fact agreement simply afforded appellant the "opportunity to bid" on subsequent procurement rings. Therefore, WMATA contends that appellant should have filed a bid protest if it considers that it was denied that "opportunity." Because protests of WMATA source selection decisions must be brought in a court of competent jurisdiction, WMATA concludes that the breach of any implied agreement is not properly reviewable by, or within the post-award "disputes" jurisdiction of, the Board.

We agree with WMATA that we do not have "protest" jurisdiction as such. *Cf. Coastal Corp. v. United States*, 713 F.2d 728 (Fed. Cir. 1983). Here, however, appellant alleges that there was a pre-existing implied agreement that it would be eligible and given the opportunity to compete that predated submission of its production contract proposal. Appellant contends that it relied on the alleged government promise that it would be eligible to compete upon satisfactory completion of the prequalification purchase order and testing requirements. Appellant's claims are based on the specific WMATA agreement not on a general WMATA obligation to consider bids fairly. Express provisions have required that multiple award contractors be provided a "fair opportunity" to be considered for orders and provide for a CDA remedy where contractors are improperly excluded from eligibility to compete. *$^{HMR}$Tech2, LLC*, ASBCA No. 56829, 10-1 BCA ¶ 34,397; *PAW & Associates, LLC*, ASBCA No. 58534, 13 BCA ¶ 35,462 at 173,906-07. If agreement on the pertinent terms is established in this case by the evidence with sufficient definiteness and specificity, we see no reason to accord different treatment to implied contracts. *Cf. Monument Realty*, 535 F. Supp. 2d at 68-72 (detailing cases finding preliminary agreements and agreements to negotiate to be enforceable where sufficiently definite and a clear intent to be bound was demonstrated). Regardless of whether Delta could have protested alleged WMATA improprieties in the evaluation and source selection process in another forum, a protest was not appellant's exclusive remedy and did not preclude Delta from pursuing breach of contract relief.

15

We also do not interpret appellant's allegations as limited solely to being afforded the "opportunity" to bid. If proven, the implied agreement encompassed Delta's eligibility and right to compete on an equal basis with Knorr and a concomitant WMATA obligation to abide by its duty of good faith and fair dealing during the acquisition process. Indeed, the duty of good faith is embedded as an essential precept of WMATA's procurement policy and expressly incorporated into the July 2013 WMATA Procurement Procedures Manual at § 2-2 which states, "These procedures require that all parties involved in the negotiation, performance, or administration of Authority contracts act in good faith." *Cf. Free & Ben, Inc.*, ASBCA No. 56129, 09-1 BCA ¶ 34,127 at 168,742 ("Implicit in every contract are the duties of good faith and fair dealing between the parties.") (and cases cited). We have jurisdiction to decide whether WMATA satisfied these alleged rights and duties, even though they may require us to consider matters related to the adequacy of competition, the provisions of the solicitation, evaluation of the competing offers and/or WMATA's source selection determination. In determining our jurisdiction over these allegations, we need not address whether the alleged conduct, if proved, amounted to "bad faith" on the part of WMATA or whether a breach of the duty of good faith and fair dealing necessarily requires a finding of "bad faith."

WMATA also labels appellant's contentions as tantamount to misrepresentation and fraud over which the Board lacks jurisdiction. We do not view the claim as alleging that WMATA officials engaged in criminal or fraudulent conduct. It simply alleges that they entered into the implied agreement. Whether the WMATA representatives' statements and conduct allegedly relied on by appellant also constituted fraud (or fraudulent misrepresentation) is beyond our jurisdiction as WMATA asserts. However, we are empowered to address appellant's allegations concerning the contractual consequences of the various communications in dispute. *Cf. The Federal Group, Inc. v. United States*, 67 Fed. Cl. 87, 102 (2005).

Appellant claims that the communications resulted in an implied-in-fact agreement. The gravamen of the claim does not seek relief based on an implied-in-law contract. Nevertheless, in Counts V and VI appellant seeks relief for "Implied-in-Fact Unjust Enrichment" and "Implied-in-Fact Quantum Meruit," respectively. It is well settled that we have no jurisdiction over contracts implied-in-law. *E.g., Altanmia Commercial Marketing Co.*, ASBCA No. 55393, 09-1 BCA ¶ 34,095. There is no basis to extend our jurisdiction to such contracts in the case of WMATA. WMATA has not waived its sovereign immunity from suits based on a contracts implied-in-law. *See, e.g., Martin v. WMATA*, 273 F. Supp. 2d 114, 119 (D.D.C. 2003); *Greenbelt Ventures, LLC v. WMATA*, No. AW-10-00157, 2010 WL 3469957 (D. Md. 2010), *on recon.*, 2011 WL 2175209 (D. Md. 2011) *aff'd*, 481 F. App'x 833 (4th Cir. 2012); *Protecting the Homeland Innovations*, 13 BCA ¶ 35,398 at 173,666-67; *cf. Merritt v. United States*, 267 U.S. 338, 340-41 (1925) (discussing the absence of such a waiver in the Tucker Act); *United States*

16

*v. Mitchell,* 463 U.S. 206 (1983); *Russell Corp. v. United States,* 537 F.2d 474 (Ct. Cl. 1976). The bases and rationale for recovery under an implied-in-fact agreement are distinct from recovery based on quantum meruit and unjust enrichment pursuant to an equitable implied-in-law contract. *E.g., Algonac Manufacturing Co. v. United States,* 192 Ct. Cl. 649, 673-77 (1970) (discussing in detail the distinctions between implied-in-fact and implied-in-law contracts); *RGW Communications,* 05-2 BCA ¶ 32,972; *The Public Warehousing Co.,* ASBCA No. 56022, 11-2 BCA ¶ 34,788. To the extent that appellant seeks relief pursuant to an implied-in-law contract, we agree with WMATA that we lack jurisdiction. Accordingly, we grant WMATA's motion to strike provisions in appellant's complaint that are based on recovery pursuant to such a contract.

### CONCLUSION

We conclude that we have jurisdiction over appellant's claims relating to the alleged implied-in-fact contract associated with the development of the friction rings and deny WMATA's motion to the extent indicated above. We grant WMATA's motion to the extent that appellant seeks interest and punitive damages. We also grant WMATA's motion to dismiss for lack of jurisdiction Delta's claims arising out of the alleged legal misadvice.

Dated: 18 March 2014

ROBERT T. PEACOCK
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Vice Chairman
Armed Services Board
of Contract Appeals

17

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 58063, Appeal of Delta Engineering, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

18